LEMMON, Judge.
A. J. Toups, Inc., a general contractor, entered into a building contract with Jole, Inc., as owner, to construct an addition to a commercial building for a price of $40,- *112 870.00. Jole’s architect prepared the plans and specifications, the requirements of which included perimeter footing of concrete with a minimum crushing strength of 3,000 pounds per square inch (p. s. i.) when 28 days old.
Toups ordered concrete of this specification from Dixie Building Material Co., Inc., and Dixie delivered the concrete for the pouring of the footing. Subsequently, the architect rejected the footing because the concrete allegedly did not meet the contract specifications.
Toups sued Dixie for the cost of remedial work required by the architect and joined Jole as an indispensible party, since the owner had withheld a portion of the final payment to cover rent losses and additional expenses necessitated by the rejection of the foundation. The trial court dismissed Toups’ suit against Dixie and rendered judgment in favor of Dixie on its recon-ventional demand for the cost of the concrete. The judgment also awarded Toups the sums withheld by Jole and dismissed Jole’s third party demand against Dixie. Toups and Jole appealed from this judgment.
The purpose of the construction was to add several bays for the servicing of automobiles to an existing Goodyear Service Store owned by Jole. The addition, measuring approximately 50' x 50', was to be of concrete block walls set on grade beams.
The perimeter footing at issue is the portion of the concrete set below grade level, and this footing supports the weight of the building. To construct this footing a trench is first excavated, and the concrete footing is then poured to the depth required by the plans and is reinforced with steel. Next, the concrete grade beams are constructed, which come up to the finished level, and the concrete block walls are then built up on the grade beams.
The structual engineering requirement of minimum concrete strength of the footing is designed to prevent breaking from underneath the building.
The concrete footing was poured on April 4, 1968, and in accordance with the usual practice in commercial buildings, a testing laboratory obtained cylinder samples of each batch of concrete. Two cylinders were tested after seven days, and the architect learned by telephone inquiry several days after the testing that the results were 1,730 and 1,770 p. s. i. Although the concrete had not yet reached its ultimate strength, the representative of the testing laboratory expressed the opinion based on experience that the concrete would not meet specification requirements of 3,000 p. s. i. at 28 days.
The architect immediately notified Toups and Jole of this development, but by this time the construction of the concrete block walls was practically completed. Toups and Dixie conducted additional testing of the concrete strength, and Dixie’s concrete expert assured the parties concerned that the concrete would meet specifications. However, Toups stopped all work on the building except that which had no relation to the footing or the walls.
After 28 days a third cylinder was tested, yielding a breaking strength of 2,020 p. s. i.[1] The architect therefore rejected the foundation as not being in accordance with minimum contract specifications.
Toups employed an engineer, who designed a standby footing system to relieve some of the roof load from the exterior walls. A standby structural system, consisting of a steel column and steel beam in a T-shape, was also designed. When this plan was approved by the architect, Jole agreed to accept the building upon Toups’ meeting certain requirements outlined in a letter agreement dated May 24, 1968. Toups installed the additional footing and met the other requirements, and the building was thereafter completed about the end of June, one month after the contract completion *113 date. Jole withheld certain amounts from the final payment to Toups, since in the letter agreement Toups agreed to reimburse enumerated expenses incurred by Jole because of the footing problems and associated delays. The retainage included the cost of the standby structural system, which was not installed but which was designed as a future precautionary measure.
From the foregoing chronology it is obvious that the pivotal issue in the action against Dixie is whether or not the concrete supplier fulfilled its contractual obligation to deliver concrete with minimum specifications of 3,000 p. s. i. crushing strength.
Normally, the testing of the cylinders obtained at the pouring is the only testing performed to insure the minimum strength requirements. However, since these test results were far below the minimum, Toups had additional tests performed in an attempt to prove up the concrete strength.
The second series, called the Swissham-mer tests, were performed approximately 30 days after the pouring and produced the following results:
Area 1 - 1,800 p. s. i.
Area 2 - 1,875 p. s. i.
Area 3 - 2,325 p. s. i.
Area 4 - 2,500 p. s. i.
Area 5 - 2,750 p. s. i.
It is admitted that this test, which has a variable of 15%, is not as accurate as the crushing test performed on the cylinders. However, even if it is assumed that the Swisshammer test results were 15% on the low side, only one area would have met the minimum specifications (2,750 + 15% or 312 = 3,062).
Also on the 30th day three core samples were extracted from the footing, and crushing tests were performed, giving readings of 2,210, 2,600 and 1,670 p. s. i.
Subsequently, another testing procedure was undertaken to analyze the contents of the cores to determine the quantity of cement in the total mix, which is composed of cement, water, gravel and sand. The architect and two concrete experts who testified all agreed that 5 to S}/z sacks of cement per cubic yard of concrete mix are recommended to produce 3,000 p. s. i. crushing strength at 28 days. However, the quantitative analysis of two samples revealed 3.39 and 3.87 sacks of cement per cubic yard of concrete.
Thus, of the numerous tests performed in the four series of analyses, none of the actual readings reached the minimum requirement.
On the other hand, a concrete expert who testified on behalf of Dixie stated that Swisshammer tests performed by him before the 28th day produced readings from 2,200 to 2,600 p. s. i., with one reaching 2,800 p. s. i. He testified from memory and did not make written recordings of these results.
On the basis of these tests, he advised Dixie that the concrete would achieve the required strength at 28 days. However, he also testified that someone at the job site had remarked that water had been added to the mix (which was denied by the architect who was present at the pouring), and this would have the effect of destroying the cement-water ratio and lowering the strength of the concrete. In our opinion this remark as to his suspected reason why the concrete strength was below standard is inconsistent with his telling Dixie “to relax” because his test results were satisfactory. Furthermore, the expert volunteered that he believed the engineer had required 3,000 p. s. i. with a designed safety factor. In other words, he felt that the engineer had “overdesigned” the footing and that the lesser strength was adequate for the purpose.
We reject this approach involving his opinion as to the adequacy of the concrete. The minimum requirements were specific and in terms in common usage in the industry. The only criteria is whether or not *114 the concrete ordered from Dixie met these minimum requirements, as determined by standard methods for testing materials. We have not been shown one test result which reached the minimum requirement.
Furthermore, Dixie did not refute the analysis which revealed that they used approximately 31/2 sacks of cement (the expensive ingredient) per cubic yard of concrete, rather than the recommended 5 to S1/2 sacks. While Dixie’s expert testified that it is possible to attain 3,000 p. s. i. strength concrete using 31/2 sacks of cement by proportionately reducing the water in the total mix, Toups’ expert observed that such a mix would contain larger proportions of gravel and sand per cubic yard of concrete and would be so stiff as to be practically unworkable.
We conclude that Dixie did not deliver concrete of the specification ordered by Toups in accordance with the minimum contract requirements. If a deficiency in the materials furnished by a supplier causes a contractor to suffer a loss on his contract with the owner, the supplier of the deficient materials is liable for the loss. See Hunter v. Mayfield, 106 So.2d 330 (La.App. 2 Cir. 1958). Toups relied on Dixie’s representation of 3,000 p. s. i. concrete, and apparently the mimimum specification was not met simply because Dixie skimped on the quantity of cement in the mix.
As to the damages for which Dixie is liable, however, there is a serious problem which cannot be resolved from the evidence contained in the record.
The seven day crushing test was performed on April 11, 1968. However, it was not until April 17, six days later, that anyone bothered to inquire about or communicate the test results. In the meantime Toups had proceeded with the grade beams and the masonry walls. If the seven day test results had been known immediately, the damages may have been substantially mitigated.
We find little evidence on the issue of responsibility during this six day period. Mr. Toups testified that it is not customary to wait on the cylinder test before proceeding to the next phase of construction, but that it was only necessary to wait a matter of days until sufficent hardening was obtained. He claimed that he proceeded with verbal approval of the architect.
We cannot, on the basis of this slight evidence, assess against Dixie all damages claimed by Toups. Mr. Toups testified that he would have halted construction on the seventh day, had he known of any problem. At that point there would have been little more remedial work than removing and replacing the footing (there is no evidence in the record of the cost of this procedure). But — did the architect or the contractor have the responsibility to verify the test results? Did the testing laboratory have any responsibility to immediately communicate the suspicious readings? Or could all parties simply proceed on Dixie’s representation of concrete strength without regard to testing procedure. We are not provided with evidence of any contractual requirements or any custom in the industry on which we can place responsibility for additional damages incurred because of continued construction during the six day period. Unless the requirements or the custom of the construction industry obligate the contractor to await testing results before proceeding with the next phase of the work, this court is reluctant to impose this responsibility. Conversely, we are reluctant to penalize Dixie for additional damages that timely communication would have prevented, since Dixie had no control over construction after pouring was completed.
In any event we cannot assess Dixie’s liability at this point beyond the cost of removing the footing, although it may well be that Dixie will ultimately be held liable for all damages proved as a result of the failure to furnish concrete to the required minimum specification.
*115 For the foregoing reasons, we reverse the judgment of the district court and specifically hold that Dixie Building Material Co., Inc. failed to fulfill its contractual requirement to deliver concrete with minimum specifications of 3,000 p. s. i. crushing strength. The case is remanded to the district court for further determination of responsibility for the damages incurred by A. J. Toups, Inc. and/or Jole, Inc., in accordance with the views expressed herein.
Reversed and remanded.

. The fourth cylinder tested at 39 days yielded a breaking strength of 2,330 p. s. i.